**UNITED STATES DISTRICT COURT**

**DISTRICT OF MINNESOTA**

---

DESIREE COLLINS,

                    Plaintiff,

v.

THADDEUS P. SCHMIDT,
*acting in his individual capacity*
*as a St. Paul Police Officer*,

                    Defendant.

Civil No. 17-5369 (JRT/BRT)

**MEMORANDUM OPINION
AND ORDER ON CROSS-MOTIONS
FOR SUMMARY JUDGMENT**

---

Robert Bennett, Andrew J. Noel, and Kathryn H. Bennett, **GASKINS, BENNETT & BIRRELL, LLP**, 333 South Seventh Street, Suite 3000, Minneapolis, MN 55402, for plaintiff.

Cheri M. Sisk, **CITY OF ST. PAUL ATTORNEY'S OFFICE**, 15 West Kellogg Boulevard, 750 City Hall and Courthouse, St. Paul, MN 55102, for defendant.

Plaintiff Desiree Collins was taking out the trash in the early morning of September 23, 2017, when K-9 Gabe – the St. Paul police-dog partner of Defendant Thaddeus ("Tad") Schmidt – bit her in the leg to knock her down, clamped onto her right arm, and held on for roughly 30 seconds. Collins filed this 42 U.S.C. § 1983 excessive force action, alleging that the attack was an unreasonable seizure under the Fourth Amendment. The parties filed cross-motions for summary judgment. Because there remains no genuine dispute of material fact that Collins was seized or that the seizure was unreasonable, and because the

law was clearly established at the time of the attack, the Court will deny Schmidt's motion and grant Collins' motion. As a result, this case shall proceed to trial on damages.

## BACKGROUND

The facts of this case are largely undisputed. At dawn – about 6:25 a.m. – on Saturday, September 23, 2017, Schmidt and his K-9 partner Gabe responded to a burglary in progress in a residential neighborhood of St. Paul. (JA at 10.)[1] On arrival, Schmidt met with Officers Joel Bierwerth and Brent Campbell, who had given chase to one of two suspects but had lost track of him about one block east of the house where the burglary was reported. (JA at 10-11, 19, 30.) Schmidt took Gabe out of his vehicle, put the dog on a 20-foot leash, twice gave a K-9 warning ("St. Paul Police K-9, announce yourself right now or you will get bit; Police K-9, announce yourself, come out now or you will get bit"),[2] and commanded the dog to track. (JA at 11; *see* JA at 214 ("Bierwerth Video"), JA at 215 ("Campbell Video") (collectively, "Videos") at 38:13-38:26.)[3]

---

[1] "JA" refers to the Joint Appendix submitted by the parties. (*See* Aff. of Cheri M. Sisk ¶ 2, Ex. 1, May 31, 2018, Docket No. 17.)

[2] St. Paul Police Department policy is that "that when the use of a K-9 is justified in the apprehension of a suspect, the officer will give the verbal warning, 'Police K-9, stop or I'll release the dog.' Only if there is no response from the suspect will the K-9 be released. . . . The K-9 handler shall repeat this announcement in large or multileveled buildings as necessary. In those situations where known facts indicate that tactics and/or public safety may be compromised by a warning, the K-9 officer shall decide or recommend that no announcement be made. For those searches that the announcement is not made, the facts supporting the decision shall be included in the officers' report." (JA at 64.) No such facts appear in Schmidt's report.

[3] These citations refer to the officers' body camera video timestamps, not clock time.

Gabe quickly took the officers a half block south and a half block east before turning into a yard. (JA at 11.) Gabe and the officers spent roughly five minutes thoroughly investigating the backyards of two residences.[4] (Videos at 38:40-43:45.) During that time, the officers learned that a suspect had been apprehended; Campbell told the other officers that he believed that the suspect was likely the one they were looking for.[5] Schmidt responded, "I want to find out where he went, though. I want to find that sweatshirt." (Videos at 41:47-42:00.) Bierwerth agreed, and – as he had done before – told Schmidt that he was the boss. Schmidt responded, "You don't have to keep telling me that. I know that." (*Id.*) The officers did not discuss the other suspect, and nothing in the record indicates that they continued the search to find him. (*See id.*)

Eventually, Gabe led the officers back north, into an alleyway. (JA at 11.) Notably, Schmidt did not give K-9 warnings when the dog entered the backyard of either residence or when it went into the alley. (Videos at 38:45-38:55, 40:30-41:00, 43:35-44:00.) As the officers moved further east, "Gabe was showing some indications that he was

---

[4] When Gabe crossed the fence between the backyards, Schmidt had to give a "down" command multiple times before the dog responded. (*See, e.g.*, Campbell Video at 40:00-40:25, 43:08-43:20.) Schmidt attributes this nonresponsiveness to Gabe's excitement to track. (JA at 78-97 ("Schmidt Dep.") at 42:4-6.) Although Campbell would sometimes speak to Gabe, Schmidt did not ask him to stop – even when he did so at the same time that Schmidt had to repeat his "down" command. (*See, e.g.*, Campbell Video at 41:40-:41:50, 43:08-43:20.)

[5] It appears that Campbell was correct. The apprehended suspect was caught three blocks straight south from where Collins was bit. (JA at 14.) He was wearing a black t-shirt; police were looking for an individual in a black sweatshirt. (JA at 26.) The record is silent as to whether the second suspect, described by police as wearing a grey sweatshirt and by the burglary victim as wearing a white t-shirt, was ever found. (*See* JA at 36-38.)

searching/locating human odor." (JA at 11.) At one point, Gabe rounded the corner of a garage, disappearing out of the officers' sight to focus his attention on what officers – guns drawn – came to realize was simply a cat.[6] (Videos at 44:15-44:30.) The officers proceeded down the alley, discussing the likely path of the suspect's flight. (Bierwerth Video at 45:00-45:12.)

As the officers neared a dumpster at the end of the alley, a noise is audible on their body camera recordings; Gabe's ears perked up, his head lifted, and his pace toward the dumpster visibly hastened. (Videos at 45:22-45:30.) Perked ears and head movement can be an alert that the dog has found the source of the odor. (JA at 78-97 ("Schmidt Dep.") at 43:6-15.) Schmidt acknowledges that Gabe's ears perked, but believes that he was alerting to the sound rather than to odor; Schmidt denies hearing the sound. (*Id.* at 43:24-44:7.) Schmidt's then-supervisor, Sergeant John Linssen, agrees that Gabe was likely not alerting to human odor. (JA at 130-144 ("Linssen Dep.") at 43:10-45:2.)

In any event, Gabe quickly proceeded down the alley and circled out of sight between a car and the far end of the dumpster. A person began to scream. (Videos at 45:30-45:35.) Although Schmidt "could not see the person," he "knew Gabe had apprehended someone." (JA at 11.) Campbell observed, "Oh, there's a lady," and approached her, grabbing her arm and hanging on as Gabe pulled at her other arm.[7] (Videos

---

[6] "[Gabe] does not like cats." (Schmidt Dep. at 42:11-13.)

[7] Police dogs like Gabe are taught to "bite and hold," maintaining pressure until ordered to release and increasing pressure if resistance is encountered. (Linssen Dep. at 12:21-13:23.) The parties dispute whether the officers attempted to pull Collins back or simply held on to her arm.

at 45:35-45:40.)  Either Bierwerth or Campbell attempted to command the dog to "out," or release, which may have further aggravated the dog; Schmidt told them to "stop yelling." (*Id.*; Schmidt Dep. at 35:10-36:15, 51:5-17.)  Schmidt can be observed, still behind the dumpster, pulling in Gabe's leash foot-by-foot while ordering him to "out."[8]  (Videos at 45:38-45:42; Schmidt Dep. at 48:19-49:21.)  Schmidt wrote in his report that, as he rounded the corner of the dumpster, he saw that Gabe had "apprehended" a woman and "knew this was not our suspect."  (JA at 11.)  Gabe continued to bite even as Schmidt continued to pull in his leash and command him to "out."  (Videos at 45:42-45:48.)  Schmidt attempted to use Gabe's electric collar, or "e-collar," to persuade him to obey, but the attempt was unsuccessful.  (Schmidt Dep. at 46:2-47:10.)  Schmidt eventually grabbed Gabe with both arms and pulled him off.  (*Id.* at 45:45-46:05.)  In total, the dog was clamped onto the woman's left arm for roughly 30 seconds.

The woman was Plaintiff Desiree Collins, who was taking out the trash.  (JA at 17.)  Collins, who lost her right hand in a fire years ago, was 52 at the time of the attack.  (JA at 76.)  After the officers stood her up, she immediately asked, "What did I do to him?"  Bierwerth responded, "Nothing.  You were just in the wrong place at the wrong time, ma'am."  (Videos at 46:08-46:13.)  As Collins waited for medical help to arrive, she asked

---

The officers insist that they did not pull.  (JA at 98-114 ("Bierwerth Dep.") at 48:5-13; JA 115-129 ("Campbell Dep.") at 34:3-11, 39:7-12.)  Campbell explains that he was trained to hang on "to prevent the person being bit from harming the dog and preventing them from moving, which would cause more damage."  (Campbell Dep. at 30:23-31:4.)

[8] Schmidt explains that he had to maintain steady pressure on the leash because, if he let go, the dog might let go and "readjust" – that is, bite again.  (Schmidt Dep. at 48:19-49:21.)

the officers if they were looking for somebody in the neighborhood, and officers confirmed that they were. (*Id.* at 48:30-48:38.) Collins was taken to Regions Hospital for treatment of centimeter-deep lacerations to her arm and leg. (JA at 69-72.)

Sergeant Linssen investigated the incident. Linssen found that Schmidt's handling of Gabe and Collins after the bite was reasonable but faulted Schmidt's actions leading up to the bite, including his failure to give additional warnings, the long 20-foot lead, and improperly setting the dog's e-collar to a constant setting instead of a setting that would ramp up over time. (JA at 39-40; *see also* Linssen Dep. at 37:17-46:13.) Linssen's supervisor, Senior Commander Karsten Winger, reviewed Linssen's report and submitted the matter to Internal Affairs, recommending discipline. (JA at 37-38.) Internal Affairs and the Chief of Police agreed, and Schmidt was suspended without pay for one working day for his failure to follow department policy and training standards. (JA at 36, 43-44.) Schmidt did not appeal his discipline and stated in his deposition that he accepted it as "essentially accurate and fair." (Schmidt Dep. at 20:18-22.) Schmidt specifically admits that he should have set the e-collar at a higher setting, (*id.* at 46:2-20), and that other warnings would have been prudent, (*id.* at 66:15-23). Schmidt and Gabe left the K-9 unit; Schmidt transferred to a patrol district and Gabe retired.[9] (*See id.* at 6:11-19.) Schmidt now cares for Gabe at home. (*Id.* at 5:4-10.)

---

[9] Winger made clear that Schmidt's departure, though formally voluntary, was not optional. (JA 145-152 ("Winger Dep.") at 14:11-15:4, 22:20-23:20.)

Collins filed this 42 U.S.C. § 1983 action, alleging that the attack was an unreasonable seizure under the Fourth Amendment. (Compl., Dec. 6, 2017, Docket No. 1.) The parties filed the cross-motions for summary judgment that are now before the Court. (Pl.'s Mot. for Partial Summ. J., May 31, 2018, Docket No. 19; Def.'s Mot. for Summ. J., May 31, 2018, Docket No. 14.)

## DISCUSSION

### I.    STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### II.    SEIZURE

As an initial matter, the Court must determine whether Gabe's bite of Collins was a Fourth Amendment seizure. The Court will conclude that it was.

> A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when

the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement through means intentionally applied [to that person]. Thus, an unintended person may be the object of the detention, so long as the detention is willful and not merely the consequence of an unknowing act.

*Brendlin v. California*, 551 U.S. 249, 254 (2007) (cleaned up). In short, a seizure occurs when a person is "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower v. Cty. of Inyo*, 489 U.S. 593, 599 (1989). Therefore, the Court must determine (1) whether "the means that terminates the freedom of movement is the very means that the government intended," *id.* at 598, and (2) whether the person whose freedom of movement is terminated is the very person that the government intended, *id.*; *Moore v. Indehar*, 514 F.3d 756, 760 (8th Cir. 2008) (noting that "bystanders are not seized for Fourth Amendment purposes when struck by an errant bullet in a shootout" because they were not the intended object of the seizure, in contrast to a case of mistaken identity).[10]

Regarding the first inquiry, Schmidt weakly submits that Collins was not seized because he did not command Gabe to bite. But Schmidt admits that he gave Gabe a command to track knowing that he would bite whoever he encountered, common knowledge that Schmidt's initial warnings ("you will get bit") make clear. As such, this matter is not genuinely in dispute.

---

[10] Put another way, the question is not whether the person restrained is who the officer believed them to be; rather, it is merely whether the officer intended to restrain the person's physical body. *Moore*, 514 F.3d at 760.

Regarding the second inquiry, Schmidt contends that the bite was not intentionally applied to Collins because Collins was not the suspect and he did not know she was there; as such, Schmidt says, her injury is comparable to that of an innocent bystander struck by an errant bullet. Schmidt points to *Hansen v. City of St. Paul*: "The dispositive inquiry is not whether [Officer] Pavlak intended to release [K-9] Buster, the means of seizure, but whether he intended to seize [innocent bystander] Hansen, the eventual object of the seizure." No. 06-1286, 2007 WL 4224052, at *3 (D. Minn. Nov. 27, 2007). In *Hansen*, a police dog was chasing a suspect who ran onto a bystander's porch, and the dog mistakenly bit the bystander when she grabbed the suspect to stop him from running into her home. *Id.* at *1. As such, *Hanson* is analogous to those cases in which bystanders are struck by an errant bullet in a shootout – the suspect and the injured party were next to one another and the force aimed at the former missed and was thereby mistakenly applied to the latter. But that is not the case here: Collins was bit by mistake, but not because Gabe missed. As such, *Hansen* is distinguishable, if not inapposite.[11]

---

[11] Moreover, asking whether the officer "intended to seize Hansen" erroneously implies that a generalized intent to seize one's person is insufficient. This phrasing mirrors language in the district court opinion in *Moore v. Indehar*, No. 05-451, 2006 WL 2708634, at *3 (D. Minn. Sept. 20, 2006), *rev'd and remanded on other grounds*, 514 F.3d 756 (8th Cir. 2008). The Eighth Circuit reversed the district court's conclusion that the defendant did not intend to shoot Moore based on the factual record, not error in the formulation of the principle. Nonetheless, this phrasing obscures the nature of the inquiry. The question is not whether the officer intended to restrain Hansen *qua* Hansen or Moore *qua* Moore, but rather whether the officer intended to restrain their persons – regardless of who the officer thought they were or what the officer thought they may have done. In each case, the officer had intended to restrain the person of another – the suspect – but missed.

This case is better understood as one of mistaken identity.  Because the nature of a

police dog is to bite the first person it encounters, the dog effectively perceives the first

person it encounters to be the suspect.  Schmidt knew that Gabe was likely to bite the first

person he encountered during the search for the suspects, (Schmidt Dep. at 61:25-62:3); as

such, Schmidt intended for Gabe to seize the first person he encountered.[12]  Moreover, the

fact that Schmidt put Gabe on a 20-foot lead ensured that he could do so with ease.  Other

district courts confronting similar facts have reached the same conclusion.[13]

---

[12] The parties dispute the extent to which Schmidt's subjective intent matters.  It is certain
from *Brower* that an officer may be liable in cases of mistaken identity, but it is implied by
*Brendlin* that the only intent that matters is that which is "objectively manifested."  *Compare* 489
U.S. at 599, *with* 551 U.S. at 260.  In 2011, the Eighth Circuit noted that "*Brendlin* seemed to steer
the analysis toward an inquiry into 'objective intent,'" but concluded that "it was not clearly
established as of September 2007 that an officer in Missouri could effect a seizure under the Fourth
Amendment without subjectively intending to do so."  *Gardner v. Bd. of Police Comm'rs*, 641
F.3d 947, 951-53 (8th Cir. 2011).  Schmidt submits that *Gardner* shows that subjective intent may
be considered, *id.*; Collins submits that *Gardner* shows that subjective intent is not necessarily
controlling, *id.*, and that a subsequent Eighth Circuit case shows that the pre-*Brendlin* bystander
cases focusing on subjective intent are no longer good law, *Atkinson v. City of Mountain View*,
709 F.3d 1201, 1208 (8th Cir. 2013).  It makes no difference here.  Schmidt's objective intent is
crystal clear − the fact that Collins wondered what she had done wrong and surmised that the
officers were looking for a suspect demonstrates her belief that she had been targeted for seizure
− and Schmidt's subjective intent to seize the first individual Gabe encountered is sufficient to
collapse the two inquiries into one.

[13] In *Mancini v. City of Indianapolis*, No. 16-2048, 2017 WL 4250112 (S.D. Ind. Sept. 26,
2017), "officers released a[ ] . . . canine while in pursuit of a suspect fleeing a traffic stop.  Hearing
a commotion and hearing her dog barking, Ms. Mancini stepped out of the front door to her home.
When she did so, [the] canine, who was inside of Ms. Mancini's fenced yard, attacked and mauled
her."  *Id.* at *1.  The court denied the City's motion to dismiss because this seizure could be viewed
as unreasonable.  *Id.* at *5.  The court expressly distinguished transferred-intent doctrine, making
clear that the dog's training to seize the first person it sees demonstrates specific intent.  *Id.* at *4.

In *McKay v. City of Hayward*, 949 F. Supp. 2d 971 (N.D. Cal. 2013), "[o]fficers used a
police dog to track an armed suspect who fled after robbing a Domino's Pizza at night.  Nicky, a
Dutch Shepherd trained to bite and hold, guided the officers to an eight-foot wall. Police Officer

This conclusion is reinforced by the Eighth Circuit's implicit holding in *Szabla v. City of Brooklyn Park* that a seizure occurs when a police dog seizes an individual that police did not know to be present, at least when police initially believe that the individual is the suspect. *See* 429 F.3d 1168, 1172-73 (8th Cir. 2005), *reh'g en banc on other grounds*, 486 F.3d 386 (2007).[14] Here, when construing the facts in the light most favorable to Collins, the early morning hour and relative quietness of the neighborhood allow the inference that Schmidt believed that only the suspects were out. That Campbell observed "it's a lady" with apparent surprise shows that the officers may have thought that Gabe had seized the suspect, at least until Campbell saw Collins.

---

Loring Cox, without warning, lifted Nicky over the wall and lowered him on a thirty-three-foot leash into the backyard of a mobile home. Jesse Porter, an 89-year-old who resided in the mobile home and had no connection to the robbery, was alone in his backyard. Nicky bit Porter on the leg, leaving a gaping hole." *Id.* at 971. The court concluded that Porter was seized but found that it was not clearly established that the seizure was unreasonable. *Id.* at 979, 984-85.

In *Garcia v. City of Sacramento*, No. 10-826, 2010 WL 3521954 (E.D. Cal. Sept. 8, 2010), "officers were pursuing a suspect, Manuel Prasad. Mr. Prasad failed to stop for a taillight violation. Hearing the sirens and police helicopters, Plaintiff walked over to a neighbor's backyard to speculate why law enforcement was in the neighborhood. Suddenly, Plaintiff was attacked by [K-9] Bandit." *Id.* at *1. The court denied the Defendants' motion to dismiss because the complaint sufficiently alleged a seizure.

And in *Brown v. Whitman*, 651 F. Supp. 2d 1216 (D. Colo. 2009), "[b]etween 2:00 and 3:00 a.m. on July 14, 2005, a[n] officer who had his police dog off leash, was searching for two suspected carjackers in a residential neighborhood. The police dog located plaintiff Ticoa Brown, who had the misfortune of being in her backyard at the time of the search, and bit her, causing injuries." *Id.* at 1218-19.

[14] "[Officer] Baker and the dog ran through the park. They approached the shelter for the portable toilets. As soon as he came by the wall, [K-9] Rafco turned in the shelter and bit Henry Szabla, [a homeless man] who was lying on the floor of the shelter." *Szabla*, 429 F.3d at 1171-72. The Eighth Circuit concluded that Szabla had "a submissible case of excessive force." *Id.*

-11-

Because Schmidt intended for Gabe to seize the first person he encountered, because Gabe did seize the first person he encountered, and because Collins was that person, Collins was seized.

## III.   REASONABLENESS

Because a Fourth Amendment seizure occurred, the Court must determine whether the seizure was reasonable.  The Court will conclude that it was not.

To determine whether a seizure is reasonable, the Court must weigh "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake."  *Howard v. Kan. City Police Dep't*, 570 F.3d 984, 989 (8th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  *Graham*, 490 U.S. at 396.

Governmental interests include "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight."  *Id.*  Here, the *Graham* factors cut in favor of Schmidt's decision to deploy the dog in the first instance – burglary is a serious crime, the suspect (who broke into an occupied house) posed a threat to law enforcement and the public, and the suspect was in flight.  But the fact that Campbell (who had observed the suspect fleeing from the house and had briefly given chase) believed that the apprehended suspect was the one Gabe was deployed to find and said as much to

-12-

Schmidt raises a serious question whether it was reasonable to continue the search with Gabe. "[A] reasonable officer is not permitted to ignore changing circumstances and information that emerges once arriving on scene." *Neal v. Ficcadenti*, — F.3d —, No. 17-2633, 2018 WL 3397636, at *3 (8th Cir. July 12, 2018). Construing the facts in the light most favorable to Collins, this fact alone – especially combined with Schmidt's response ("I want to find that sweatshirt") – is sufficient to deny Schmidt summary judgment on the question whether the resulting seizure was reasonable.

Turning to Collins's Fourth Amendment interests, factors to be considered in determining whether use of a police dog was reasonable include whether a warning was given, the officer's degree of control over the dog, and whether the bite was terminated in a reasonable amount of time. *See Gurule v. Ambuehl*, No. 17-826, 2018 WL 1384464, at *17, 21-23 (D. Colo. Mar. 16, 2018) (collecting cases). Schmidt's chain of command, up to and including the Chief of Police, concluded that his failure to give additional warnings, his decision to give Gabe a 20-foot lead, and his failure to stop Gabe from passing out of sight behind the dumpster violated Schmidt's training and department policy. Schmidt does not dispute these conclusions. The Court will find that, even construing the facts in the light most favorable to Schmidt, Schmidt's actions were unreasonable as a matter of law.

First, it was unreasonable for Schmidt not to give additional warnings because Collins could not have heard, and did not hear, his initial warnings. The "presence or absence of a warning is a critical fact in virtually every excessive force case involving a police dog." *Kuha v. City of Minnetonka*, 365 F.3d 590, 599 (8th Cir. 2003), *abrogated in*

*part on other grounds by Szabla*, 486 F.3d at 396.  "[T]he general rule is that absent a threat

to his safety, a police officer must warn a suspect before releasing a dog upon him."  *Grady*

*v. Becker*, 907 F. Supp. 2d 975, 980 (D. Minn. 2012) (citing *Kuha*).[15]  Schmidt contends

that *Kuha* requires only "giving the suspect a warning," 365 F.3d at 598, but the purpose

of a warning is broader – to "enable innocent persons to exit the area and afford suspects

an opportunity to surrender," *id.* at 599 (quoting *Vathekan v. Prince George's Cty.*, 154

F.3d 173, 176 (4th Cir. 1998)).  As such, it makes no difference whether Schmidt thought

Collins was the suspect or whether he knew she was present.[16]  Schmidt further contends

that he complied with *Kuha* because he gave two warnings when he started the search.

Shouting a warning into the void is insufficient.  Presumably, that is why St. Paul policy

mandates repeated warnings in large or multileveled buildings, (JA at 64), and why

Schmidt's failure to give additional warnings played a role in the decision to discipline

him, (JA at 39-40).  Schmidt acknowledges that Collins did not hear his warnings, (Schmidt

Dep. at 55:2-4), and that most handlers would have given additional warnings and that

doing so would have been prudent, (*id.* at 66:15-23).  Schmidt's supervisor acknowledged

---

[15] It is undisputed that additional warnings would not have threatened officer safety; thus, this is not one of the "exceptional cases where a warning is not feasible."  *Kuha*, 365 F.3d at 599.

[16] Taking the facts in the light most favorable to Collins, Schmidt should have realized that someone was behind the dumpster.  Although the officers state that they did not hear the lid closing, a reasonable jury could find that Gabe alerted moments before circling around the dumpster, and that a reasonable officer should have noticed his alert and given a warning at that point.  (*See* Linssen Dep. at 43:1-24.)  Like Schmidt's decision to continue the search after the suspect as apprehended, this fact alone is sufficient for Collins to survive summary judgment.

that Schmidt's warnings would not have been effective to Collins and that effective warnings are required. (Linssen Dep. at 33:7-20, 37:17-38:12.) Taken together, this evidence shows that Schmidt's failure to give effective warnings during the seven-minute search was unreasonable as a matter of law.[17]

Second, it was unreasonable for Schmidt to give the dog 20 feet of leash. A 20-foot lead might be reasonable in an open field, but not in a crowded urban area. This long lead allowed Gabe to advance out of sight behind the dumpster. *See McKay*, 949 F. Supp. 2d at 981 (30-foot lead). Schmidt's sergeant testified that a 4- to 6-foot lead would have been appropriate – and that he would not have approached the dumpster from a blind angle at all. (Linssen Dep. at 45:3-46:5.) This conclusion does not require the benefit of hindsight: the fact that Gabe had already disappeared out of sight once to bark at a cat put Schmidt on notice that the 20-foot lead was too long. Taken together, this evidence shows that Schmidt's lack of control over Gabe during the seven-minute search, and particularly as

_____

[17] Schmidt contends that there is no legal standard governing when additional warnings are appropriate. Not so. The St. Paul policy requiring repeated warnings in large or multilevel buildings codifies the common-sense point that a warning must be audible to be effective and implicitly requires repeated warnings in other similar circumstances. If Schmidt had given additional warnings before entering either of the two backyards he searched at length, or moving into the alley, or proceeding a half block down the alley, his position might be defensible. But he didn't. Thus, even taking the facts in the light most favorable to Schmidt, his best contention is that it cannot be right that he "was in a constant state of violating constitutional rights as he walked down the alley and Gabe searched for human odor – he just did not know whose rights, if anyone's, were being violated." (Def.'s Resp. at 8-9, June 21, 2018, Docket No. 23.) But, comparable to an officer who would drive down the street with a plan to blindly arrest the first person he encounters, Schmidt's failure to give effective warnings before deploying Gabe into new areas left him in a constant state of proto-violation that was reified when Collins was seized.

the officers approached the readily-apparent blind spots near the end of the alley, was

unreasonable as a matter of law.

Third, the bite was prolonged because Gabe did not respond to Schmidt's "out"

command, (Schmidt Dep. at 25:25-26:8), and his e-collar was on a training setting instead

of the field setting, (*id.* at 46:2-20). Linssen attributes these issues to training failures. (JA

at 40.) As such, taking the facts in the light most favorable to Schmidt, he acted reasonably

after the bite took place – though a reasonable jury could disagree.[18]

In sum, because there is a serious question as to whether there was any governmental

interest justifying the search after the suspect was apprehended and because Schmidt's

failure to give effective warnings and maintain control of his K-9 partner were

unreasonable as a matter of law, the seizure of Collins was unreasonable.

## IV.    QUALIFIED IMMUNITY

Finally, the Court must determine whether Schmidt can be granted qualified

immunity for his actions. The Court will conclude that he does not.

"Qualified immunity shields a public official from liability for civil damages when

his 'conduct does not violate clearly established statutory or constitutional rights of which

---

[18] Similarly, at least one of the other officers gave Gabe an "out" command and both officers may have attempted to pull Collins away – actions which likely tightened the dog's grip. Schmidt says that that he is critical of those actions, and that he told the other officers to "stop yelling." As such, taking the facts in the light most favorable to Schmidt, these actions cannot be fairly attributed to him. However, taking the facts in the light most favorable to Collins, it is notable that Schmidt did not instruct Campbell not to talk to Gabe when the dog was ignoring Schmidt's "down" commands or instruct the officers to avoid pulling Collins. (*Id.* at 50:15-51:17, 53:20-54:7; *cf. Dawe v. Rogers*, No. 09-620, 2010 WL 271435, at *5 (M.D. Fla. Jan. 15, 2010) (reasonable officer instructed suspect to stop struggling to avoid further injury).)

a reasonable person would have known.'" *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Stanton v. Sims*, 571 U.S. 3, 6 (2013)). Thus, Schmidt is entitled to qualified immunity **unless** (1) the evidence, viewed in the light most favorable to the plaintiff, establishes a violation of a constitutional or statutory right, and (2) the right was clearly established at the time of the violation, such that a reasonable official would have known that his actions were unlawful. *Id.* "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances" as long as they have "fair warning." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This does "not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (noting that such precedent may be in the form of controlling authority or a robust consensus of persuasive authority).

It is clearly established that the Fourth Amendment prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. The Court has concluded as a matter of law that Collins was unreasonably seized. As such, the Court must now determine whether it was clearly established law that someone in Collins's position would be seized and that someone in Schmidt's position would have known the seizure was unreasonable.

Regarding the seizure, it is implicit in the Eighth Circuit's holding in *Szabla* that the plaintiff made out a submissible case of excessive force that a dog bite of an unknown

person is a seizure. This implicit holding has been recognized in passing by another district court in this circuit. *See Mortensbak v. Butler*, 102 F. Supp. 3d 1085, 1098 (D.S.D. 2015) (distinguishing the failure to warn a suspect who was actively resisting arrest). And, as above, it is confirmed by the decision of every district court case cited by the parties: when a handler deploys a dog trained to bite and hold, the dog's bite of an unknown third party is a seizure. This robust consensus of on-point persuasive authority combined with the Eighth Circuit's implicit holding in *Szabla* is more than sufficient to conclude that the matter was clearly established at the time.[19]

Regarding Schmidt's failure to warn, even though *Kuha* does not explicitly spell out the obvious point that the required warning must be audible, it does establish that the warning must be "loud." 365 F.3d at 599. And it is clearly established in this district that a plaintiff's failure to hear a warning creates a triable issue of fact as to whether the officer properly gave one. *Grady*, 907 F. Supp. 2d at 982 ("A reasonable jury could infer that no warning was given from the fact [the suspect and two officers] did not hear one."); *Kruse v. Jackson*, No. 05-2123, 2006 WL 3758204, at *5-6 (D. Minn. Dec. 20, 2006) ("[T]here is a clear factual issue on this point: plaintiff and his witness deny hearing a warning; Officer Jackson claims he gave one."). Here, it is undisputed that Collins did not hear Schmidt's initial warnings and that Schmidt failed to give any others. And, taking the facts in the light most favorable to Collins, Gabe's apparent alert should have triggered Schmidt

---

[19] If this a case where – as in *Hanson* – an untethered Gabe bounded down the alley in hot pursuit of the suspect, only to veer off and bite Collins, the outcome might be different.

to give an additional warning because he should have realized then that someone may be present, even if Gabe was only reacting to a sound. The Court concludes that Schmidt had fair warning that an effective warning – that is, an audible warning – was required no later than the apparent alert.

Regarding Schmidt's handling of Gabe, even though *Kuha* does not explicitly spell out the obvious point that a reasonable officer should have control of his K-9 partner, it does make clear that warnings are intended to "increase[] the likelihood that a suspect will surrender," 365 F.3d at 599, and to "enable innocent persons to exit the area," *id.* (quoting *Vathekan*, 154 F.3d at 176). As Gabe's disappearance out of sight to bark at a cat should have demonstrated to Schmidt, giving Gabe such a long leash in an urban area deprived Collins of that opportunity. Even if this case were "novel," Schmidt was surely on notice that his conduct was unreasonable. *Hope*, 536 U.S. at 741. Even if the person behind the dumpster had been the suspect instead of Collins, the 20-foot lead would have prevented Schmidt from determining whether he was attempting to surrender before Gabe struck. And, taking the facts in the light most favorable to Collins, Schmidt had every reason to believe that the suspect had already been apprehended and posed no further threat to the officers or the public. *See Smith v. Buck*, 564 F. App'x 258 (8th Cir. 2014). The Court concludes that Schmidt had fair warning that it was unreasonable to deploy Gabe in these circumstances and handle him in a manner that precluded suspects an opportunity to surrender and enabled innocent persons to exit the area.

In sum, the Court cannot agree that Schmidt's judgment was "reasonable but mistaken." *Stanton*, 571 U.S. at 3. While there is no evidence that Schmidt knowingly

violated the law, there is no question that he should have known better. As such, Schmidt is not entitled to qualified immunity.

## CONCLUSION

Both parties have noted that this case comes to the Court in an atypical posture: few facts are in dispute, and both the City and Officer Schmidt have acknowledged that what happened was a terrible mistake. Schmidt's contention is that his actions, while negligent, did not rise to the level of a constitutional violation. But even taking the facts in the light most favorable to Schmidt, his actions were more than negligent. They were reckless. And they violated Collins's clearly established constitutional rights. As such, this is the very rare § 1983 case where the plaintiff has proved her case as a matter of law. Because the Court will grant Collins's motion for summary judgment on liability, the case shall be placed on the Court's next available trial calendar for trial on damages.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [Docket No. 14] is **DENIED** and Plaintiff's Motion for Partial Summary Judgment [Docket No. 19] is **GRANTED**.

DATED: August 9, 2018  _____s/John R. Tunheim_____
at Minneapolis, Minnesota.  JOHN R. TUNHEIM
Chief Judge
United States District Court